of the city of Minneapolis. The fifth case for argument is Ewan Leask v. City of Minneapolis et al. Mr. Laterman. Good morning, Your Honors. May it please the Court, my name is Zoris L. Laterman. I'm here on behalf of Ewan Leask, the appellant, with my co-counsel Tim Phillips. The issues in this case are not new. They've been before this Court several times. Obviously, every case is different with a different spin on the facts. But the primary issue is the issue of whether a police officer who fires a 40-millimeter round into a person at a demonstration, whether that constitutes a seizure under the Fourth Amendment. We have a couple cases that have addressed this. We have the Dundon case, which is the most cited, one of the earlier cases that deals with this issue. We also have the Marks v. Bauer case from, I believe, about a year, maybe 18 months ago, which I believe is now pending on remand. And we also have a most recent case from this circuit just, I think, three or four weeks ago, Coop v. Starkey County, which addressed this issue as well. Your Honors, one of the issues that is present in this case that really isn't addressed in the other cases is the issue of deadly force. The Marks case deals with the issue of deadly force. What kind of force? Deadly force, Your Honor, use of deadly force. The Dundon v. Kirchmeier case, that issue was not present in that case. It wasn't briefed. It wasn't discussed at all by the circuit. In what case? The Dundon v. Kirchmeier, Your Honor. The most recent case from a few weeks ago, the Coop v. Starkey County case. In that case, this Court also decided that the incident in that case was not a seizure. But again, the issue of deadly force was not briefed. It was not addressed by this Court. The issue of deadly force is at the center of this case because, in this case, we are arguing that Officer Pinez used deadly force on Mr. Leisk when he shot him in the head. And this is also, our argument is supported by Minneapolis Police Department policies which prohibit, first of all, the policy, this is policy What did the district court decide on the deadly force question? The district court decided a couple things, Your Honor, but the district court only decided that this was not a seizure, that Mr. Yes, but that question is different under the deadly force case, the first one. The Dundon v. Kirchmeier? No, the Supreme Court. Justice White's case about if you use deadly force, that's a seizure. Yes, of course, Your Honor. Then you have to define deadly force. Yes, and deadly force is defined by the Supreme Court as such force that creates a substantial risk of causing death or serious bodily injury. This is the Richard v. Hutchins case. What did the district court decide on that? Your Honor, I don't have a... Was it presented as an issue to the district court? Well, yes, Your Honor. We, of course, made the argument that this was a case of deadly force. Tell me, you know, you can argue excess force without having to deal with deadly force versus non-lethal but significant force versus de minimis force. Yes, Your Honor. All of those are analyzed differently under the seizure cases. Your Honor, the reason why some of these cases are being dismissed is because the court has decided that the law was not clearly established that shooting a non-lethal projectile at a protester constitutes a seizure. That's the reasoning behind some of these cases being dismissed. Is that what the district court found, that there was no seizure here? Yes, Your Honor. The district court found that there was no seizure and that the law was not clearly established. I don't recall the district court use the words deadly force in the analysis. Well, Your Honor, we presented the deadly force arguments to the district court. Well, did you move to reconsider? If this was deadly force, your analysis is wrong. No, Your Honor. We did not move the district court to reconsider. How is it preserved for us? Because we made the same arguments to the district court. Give me a citation to the record where you made that argument. Your Honor, I apologize. I don't have the briefing. Is there a transcript of the, I assume there was probably a lengthy argument hearing? Yes, Your Honor. We had an argument before Judge Brazel. She's very thorough. Yes, she is. So if you argued that as something that needed to be decided and she didn't mention it, I'd be very surprised. Your Honor, we I can assure the court that we made these arguments at the district court. Well, I want a citation. Okay. When I have our break between the arguments, I will go back and I'll pull the same arguments from everything. So the fact that how does deadly force change the district court's analysis or how should it have changed the district court's analysis? Your Honor, because deadly force is by its nature intended to restrain. It's intended to incapacitate. Well, I was asking I don't know if you were here for the first case. That's some of the questions I was asking back then. What's your best case on that? Well, Your Honor, I would cite back to the Cole v. Hutchins case. Okay. And the Marks v. Bauer case, which talks about a line of cases dealing with deadly force. Do those cases at all address whether it needs to be the intentional application of deadly force or not? I'll just let you know where I'm going on. I mean, I don't know what to do with the district court's observation here that the officer cannot aim at what he cannot see. Help me deal with, what do you think I should do with that? Is it, I mean, that seems to me like a factual finding. We've got videos. Yes. The videos, I guess you can take a different perspective, don't clearly contradict that. Does that finding that the officer could not see your client undermine your deadly force argument or not? It could, Your Honor. But the issue itself of whether Officer Panez could or could not see Mr. Leesk, that in itself is an issue that's in dispute. There's a video on it. There's videos. Yes. And so how is it this Court has said a video can be so clear as to trump the normal need for a question to go to the jury? And that's what the district court decided here. Your Honor, what Officer Panez saw with his eyes isn't necessarily with the same clarity or the same focus as what we can see in the video. If it doesn't involve intent by the officer, then the officer's vision is entirely relevant. Is it not? Your Honor, the officer's vision, of course, is relevant. I'm just saying that if Well, it's just positive. I mean, what do you have if the video shows from the perspective of the officer that the officer there couldn't see? I think you had an expert witness, didn't you, that testified that he thought it was an intentional shot. We've had more than one qualified immunity case today. If I'm getting them confused, that's possible. But that, to me, is the only sort of wrinkle in here that you might leverage against the district court's factual finding. Your Honor, the officer Panez had a scope on his launcher. What we see in the videos is a body-worn camera of him sitting up on the roof far away from the parking lot. He could see the parking lot through the scope much better than what the video shows to us, that we can see. So that's the error in the district court, that it didn't consider the existence of a scope on the weapon? That's one of the errors. There are multiple other issues, because when Officer Panez was asked why he fired the shot that had misreleased, his answer was, I don't remember. When he was asked, who did you fire the round that had misreleased, his answer again is, I don't remember. How does that mean that he could see your client? Your Honor, because these are weapons that are intended to be shot with precision. And he also testified that he was not using this weapon as a means to disperse a crowd. He was targeting specific individuals who he thought were committing crimes or doing something dangerous. He was trying to get them to stop doing whatever they were doing. So your argument comes down to, you think there's a factual dispute about whether the officer could see your client? There is a factual dispute as to whether he could see him. There is a factual dispute there are different inferences that a jury could reach as to whether he intentionally targeted, misreleased. You would agree, though, if he couldn't see him, he couldn't intentionally target him? Yes. If he could not see a person, then yes, he could not target them. Because that seemed to be what the district court hung its hat on. And then you're suggesting that was a faulty, that was a dispute about that. Yes. Our position, Your Honor, is that these are questions that should be left up to a jury. Because again, what he saw through the scope is not the same thing as what we or the district court can see through the body-worn camera video. And again, this policy, the Minneapolis Police Department policy, specifically prohibits policy 5317, this is appendix pages 160 through 162, this policy prohibits Minneapolis police officers from using these 40-millimeter launchers as a tool for crowd dispersal. You cannot do that. And in the other cases, that was not an issue. In fact, in the Coop case, the officers did remember in that case what they were doing. And they testified in both those cases that they were specifically using these weapons as a means to disperse the crowd. Isn't the analysis objective, though? The analysis is supposed to be objective. But as we are learning in some of these cases involving demonstrations, it appears that partially the analysis is subjective as well. It's never objective if it comes out the wrong way. I hear that time and time again, although never explicitly. Right. Your Honor, our position is the analysis should be objective. The analysis should be objective as to whether, similar to any other case, but whether a reasonable officer under these circumstances would have intended to seize a person using this kind of a weapon. And again, a shot to the head... But if it's subjective, it doesn't automatically go to a jury. No, Your Honor. It doesn't automatically go to a jury. We have so many cases where it does, where it was considered where it was decided on record by the court. Yes, absolutely. But this is a case where that factual finding could not be made. Counsel, do I understand your position is that it's undisputed that the round was not discharged for purposes of dispersal? Per Minneapolis Police Department policy, that is prohibited. And Officer Pernas didn't testify that he was using his weapon to disperse a crowd. He testified that he targeted specific individuals. In fact, this is in Appendix, our Appendix, pages 1129 through 1131, he actually was questioned and he talked about who he targeted. He said he targeted somebody with several pieces of concrete. But you could target specific individuals and still be intending to disperse as opposed to restrain? Yes, you can. But we don't know why he... So you're saying it's just not known and that that's a factual dispute? What we're saying, Your Honor, is that a reasonable jury can draw an inference on this case that he intended to incapacitate Mr. Leisk by targeting him and shooting him in the head. If he shot him somewhere else, that's not deadly force. It's shooting a person in the head or in the neck that constitutes deadly force. I have two minutes left here, so I'll save the rest for rebuttal, Your Honor. Thank you. Ms. Robertson. Good morning, Your Honors. May it please the Court. My name is Heather Robertson. I'm an Assistant City Attorney for the City of Minneapolis. I am representing appellees, City of Minneapolis and former Minneapolis police officer Jeffrey Panaz. Your Honors, the district court rightly dismissed the Fourth Amendment and the First Amendment claims and the tagging Bonnell claim because appellant has no evidence to support the contention that Officer Panaz intentionally struck Mr. Leisk with a projectile. It is the appellant's burden of proof to have evidence on which a jury could find that Officer Panaz intentionally struck him. The district court found the video shows that at the time Officer Panaz fired his weapon, which is shown broken down frame by frame, synchronized videos from multiple angles, that Mr. Leisk was simply not visible to Officer Panaz. Even with the scope? The scope, as Officer Panaz testified, does not provide magnification. Plus, the scope is zeroed at 50 feet. That means that when you put the dot of the scope on your target, if you're not 50 feet away, it's going to actually not hit where that dot is aimed. What was, remind me, the distance here? It was 178 feet, and our experts have testified, and there's nothing in the record to dispute this, that at that distance you would need to aim at least 3 feet above your target for the actual projectile to strike, you know, it's going to strike 3 feet lower than when you have that dot. So if he had actually aimed his dot at Mr. Leisk's head, which he couldn't have done because he couldn't see him because Mr. Leisk was behind a tree, it still would have hit 3 feet lower than that head. So he couldn't have specifically aimed. Appellant's own expert testified that he believed it was unlikely that at that distance Officer Panaz could have intentionally struck Leisk in the head. Didn't the expert also testify about or draw inferences from the evidence and suggest that there was intent? I can't find it in front of me now, but that was my recollection. It was a little bit fuzzier. What the expert says is that the 40mm launcher is not used as a mass dispersal tool. You don't like pepper the crowd with 40mm projectiles. So he said that what his inference was was that Officer Panaz was attempting to target someone. And so he says Leisk, but when I asked him at the deposition, he says, I do believe it's possible that Mr. Leisk was hit inadvertently or accidentally. So he does not bridge that gap for appellants to have something in the record besides the fact that Mr. Leisk was struck to show that the strike was intentional. So the case on this is Morvey Indahar. Now that was a deadly force case. That case, the officer was firing lethal bullets at a suspect. And the court in that case said, you have to have more than just the fact that the victim was struck. You have to have something to show it was intentional. In that case, the evidence that they had was that the officers were trying to stop everyone in the vicinity to arrest them, to detain them. They showed that, you know, because he was using a lethal handgun, that the inference would be that the gun would strike exactly who you were aiming at because of the rapidness of the velocity of the bullet. They don't explicitly talk about the velocity, but that's the inference. And so there's more than just the fact that the person was struck. Here, we just don't have that. You can see on the videos that Mr. Leisk is behind a tree and moving from west to east at the time that Officer Panaz is firing. Mr. Leisk's own camera, which you can see he's holding in front of his face, shows that where the officers are on top of the roof is obscured by the tree. So he can't see Officer Panaz. And Officer Panaz's video shows he can't see Mr. Leisk. And so what you're left with is nothing besides the fact that Mr. Leisk was hit to show that Officer Panaz intended it. And on the other side, again, you have that Mr. Leisk couldn't be seen. You have the great distance that the officer is firing from. You have Plaintiff's own expert saying it would be very unlikely to intentionally hit your head target at that distance. You have the defense expert saying, again, you wouldn't be able to hit someone at that distance. It's going to drop three feet from where you're aiming at, so you're going to have to try to compensate for that. Officer Panaz is not, you know, an expert marksman with the 40 millimeter. He had taken one training the year before, and this was the first day that he was using a 40 millimeter projectile in the field. So this isn't a case like Mark's where you have the officer saying, I was intending to strike him, and they talked about he was a well-trained SWAT officer. Officer Panaz was doing the best that he could to protect the 3rd Precinct and hold the line and deter individuals, repel specific individuals who are engaged in activity. But there's nothing to show not even, Panaz doesn't admit that he was aiming for Leisk. He doesn't say he would have been aiming for Leisk. He said, I wouldn't go for someone who was holding a camera if they were not doing anything else. I would not aim at someone. The people I was aiming at were the people that were causing who were assaulting officers. He had plenty of targets without having to aim at random people who were doing nothing. And this is kind of like the Cupp v. Sarpy case where your Honor's opinion talks about how you can infer what I read from this, and you can obviously tell me what you meant. But he was like this officer, right before he struck Mr. Cupp, fired at a person nearby, he hit the ground, and then he hit the person, and the person left. The officers weren't arresting people. You have hours of video in this case showing that nobody in the crowd was getting arrested. The officers were targeting individuals with 40 millimeter projectiles. Is this, your friend on the other side started his argument talking about this is a deadly force case, or it was a deadly force case in the District Court. Do you agree with that? I agree that they have talked about deadly force, and that the District Court only mentioned deadly force in a footnote in the decision. And the District Court said in that footnote because I find that Officer Panaz wasn't targeting him and didn't intend to hit him, and wasn't seizing him, that I am not going to do an analysis of the plaintiff's deadly force argument. And because the Morvey Indahar case is also a deadly force case, if Your Honors agree with the District Court that Officer Panaz cannot aim at what he cannot see, then you don't even have to, like the District Court, don't have to go into the deadly force analysis. But there is no evidence in the record not only that Officer Panaz was not, was intending to hit Mr. Leisk, or that he was intending to hit him in the head, that this was in fact an intentional use of deadly force, which I would submit you do need to show that there is intentional use of deadly force. I think that was implied by the Court in Marks. They're like, it's a jury question whether he intentionally hit Mr. Marks in the head, making it deadly force, or if he hit what he was intending somewhere else. And so what I would say is that Plaintiff's deadly force argument is inopposite to the question of whether Officer Panaz intended to hit Mr. Leisk. But even if we get to the question of whether he was intending to seize Mr. Leisk, there isn't evidence in the record to show that he was intentionally trying to restrain Mr. Leisk. Nothing in that whole situation would give anyone the idea that Mr. Leisk was trying to be apprehended, trying to be detained, or any of the traditional ideas as described in Torres v. Madrid of what is a restraint, an arrest, a detention. And so even if Your Honor finds that Officer Panaz, that there could be something for a jury to hang their hat on, that Officer Panaz intentionally struck Mr. Leisk and wasn't aiming for someone else, then it comes to the question of was it a seizure? It still wasn't a seizure. Well, I should say, if he wasn't intending to hit him, not a seizure of Mr. Leisk, and he doesn't have a claim. If he was intending to repel Mr. Leisk, it's not a seizure, and he doesn't have a Fourth Amendment claim. Nothing in the record shows that there was an objectively manifested intent to restrain Mr. Leisk. Nobody else was being restrained. Mr. Leisk was not told to stop. He was free to leave the area. There is nothing that would give them the idea that this was an intentional seizure. And I just want to make sure. And also, I want to talk about this question of the policy, the Minneapolis Police Department policy. Counsel said it prohibits using them for dispersal. That's not what it says. It's prohibited to be used for crowd management. Crowd management, as plaintiff's own expert talks about, is a level of public order policing response. Crowd management is when you have sufficient resources and it's just kind of more of a calm situation and you have control of the situation. So they're saying in that situation where things are under control, you should not be using the 40 millimeter projectile for crowd management purposes. What we were in at this stage was called a crowd control situation where you have to actually use force to maintain order in the situation and things are starting to get out of control. And Mr. Davidson, the plaintiff's expert, agreed that this was a situation that could have been a crowd control situation. So saying that they weren't allowed to be used for dispersal is incorrect. That's not what the policy says. It's just not to be used for crowd management which is a lower level of trying to keep a public order situation under control. Even so, that's not dispositive because a police policy doesn't give anyone any individual rights. And then counsel agreed or counsel said it's undisputed the court asked is it undisputed that it was not discharged for the purposes of dispersal? And that is highly disputed. Officer Panez testified that all he was doing was trying to repel individuals who were engaged in assaulted behavior. He was not trying to arrest anyone. He wasn't trying to seize anyone. He was just trying to repel individuals. And I would point your honors to the case of Martinez v. Safi where one individual ICE officer pushed one individual attorney and the court said it's not clearly established that you cannot use force to repel someone. And that person fell and they hit themselves and they hit the heads. So like Mr. Leis, they had a serious head injury and yet even though they were only one person, so you're not trying to disperse a crowd like in Dundon v. Kirkmeyer, you can still repel a single individual without it becoming a seizure. Or I should say Do I understand from the other side that the officer doesn't remember who he was targeting? The officer does not remember taking this shot at all. But what he does know is that he was not intending to hit anyone who wasn't engaged in assaulted behavior. He gave examples of what he can remember. For example, that he saw a guy that was collecting rocks to bring them up to the barrier and throw at people. And that was an example of a person he could target. But no, he was on duty for hours at a time for days in a row. He fired his 40mm launcher. He says at his deposition 10 times. If you watch the video, in that video it's more like 14 times. So he just doesn't have a recollection of what he was firing at or why. And so his testimony about what he was firing at is based on what he can see in the video. And he says, you know, it kind of looks to me like I'm firing off in this direction, but I don't remember. I don't know if I hit this guy. This video is not good enough for me to remember what I was firing at. And so we are in an objective officer situation here because the officer, subjectively, doesn't have a recollection. Objectively, what the video shows is that he picks up his weapon as soon as he sees that one guy throwing a bottle. He is waiting to fire. And then the moment he fires, Mr. Leisk is simply not visible. Objectively, that's what we see. So objectively, the court can find that there's no evidence in the record to show that Officer Pinaz intentionally hit Mr. Leisk as opposed to aiming for someone else. And so unless your honors have any further questions, I will wrap up my comments. Oh, you know, we didn't talk about the First Amendment issue. Do you want to talk about that at all? Okay. I would just submit that it is dictated basically by the Fourth Amendment results. If he was not targeting Mr. Leisk, he could not have been retaliating against him. Your honor, the video shows conclusively what happened, and I would ask that your honors uphold the district court ruling. Thank you. Judge Loken, in response to your questions regarding the citation, I was able to look up the district court record. It's document number 59. This is our memorandum to the district court. Pages 10 through 13, and also pages 26 through 28 make the precise argument we're making here that this was use of deadly force. And we also use the Bauer case, the Marks v. Bauer, and we distinguish this case from others based on the fact that this case involves deadly force. So that's a citation. Thank you. Your honors, Officer Panaz testified that he didn't fire at anyone in this AutoZone parking lot where Mr. Leisk was standing. So if that evidence is given to a jury, his testimony, I didn't shoot at anyone in this parking lot. Yet somehow it's undisputed that he shot Mr. Leisk, who was right in the parking lot. Then what does a jury make of that? That either I'm saying that is undisputed, that the projectile that hit your client came from this officer. Yes, Your Honor. The fact that Officer Panaz's projectile that he fired struck Mr. Leisk is not disputed in this case. The city hasn't disputed that. Officer Panaz has not disputed that he seems to agree that the shot he fires hit Mr. Leisk. If we take those two things, the fact that he shot and hit him, and him testifying that he didn't shoot anyone in the parking lot, how is there not a dispute for a jury to resolve as to what he intended? And this goes back to this Irish v. McNamara case that the parties talk about a little bit that deals with the difference between a mistaken identity, victim of an excessive force, and an innocent bystander. Is there any evidence that he was targeting this individual? There is evidence, Your Honor, that he may have thought that Mr. Leisk was involved in the bottle throwing, and that he targeted Mr. Leisk for that purpose. And that would make Mr. Leisk, under the Irish case, that would make him a mistaken identity victim. What is the evidence that he was throwing bottles? He wasn't throwing bottles, but there were people around him who were throwing bottles. And that's what the city's experts are saying, that Officer Panez must have been targeting one of the people who were near Mr. Leisk, who were throwing things at the police officers. Our position is that Officer Panez could have believed that it was Mr. Leisk who was throwing bottles at the police officers, and that he targeted him and shot him in the head from the rooftop. Under those facts, which a jury can adopt in this case, this is a case involving mistaken identity. Under the Irish case, that is a seizure, and that is a question that should be resolved by a jury. Thank you, Your Honor. Thank you. Very good. The case has been thoroughly briefed, and argument has helped again. And we'll take it under advisement.